UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re   MICHAEL P. LAUER, SR. | : | Chapter 7 |
| Debtors | : | Bky.  No. 19-17253 ELF |
| | : | |
| PAWNEE LEASING CORPORATION | : | |
| Plaintiff | : | |
| | : | |
| MICHAEL P. LAUER, SR. | : | |
| Defendant | : | Adv.  No. 20-204 |

# O P I N I O N

## I.  INTRODUCTION

Plaintiff Pawnee Leasing Corporation ("Pawnee") brought this adversary proceeding against the Debtor/Defendant, Michael P. Lauer, Sr. ("the Debtor") to determine whether a $53,251.74 debt is nondischargeable under 11 U.S.C. §523(a)(2)(A) or §523(a)(6).

Pawnee's claim arises out of a financing transaction with the Debtor.  Pawnee lent money to a company owned by the Debtor for the purchase of "roll-off" trash containers.  The loan was secured by the containers. The Debtor personally guaranteed the loan.

The containers have gone missing and the parties offer differing explanations for the disappearance of Pawnee's collateral.  Pawnee asserts that the Debtor's is responsible for the disappearance of the containers, rendering the $53,251.74 balance due on the loan nondischargeable.

1

For the reasons explained below, I conclude that Pawnee has not satisfied its burden of proof under either 11 U.S.C. §523(a)(2) or (a)(6). Therefore, I will enter judgment in the Debtor's favor.

## II. PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on November 19, 2019. On June 15, 2020, Pawnee timely filed a complaint to initiate the present adversary proceeding.

On February 11, 2021, I held a trial by videoconference.[1] Pawnee presented two (2) witnesses: Kenny Fitzgerald, Pawnee's Vice President of Legal and Asset Management, and Norm Stein, Vice President of Targeted Lease Capital ("Targeted").[2] The Debtor was the sole witness for his case-in-chief. The parties followed up with post-trial submissions.

## III. APPLICABLE LEGAL PRINCIPLES

### A. General Principles

One of the Bankruptcy Code's central purposes is to permit honest debtors to reorder their financial affairs with their creditors and obtain a "fresh start," unburdened by the weight of preexisting debt. See In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); In re Marques, 358 B.R. 188, 193 (Bankr. E.D. Pa. 2006).

---

[1] Due to the Covid-19 pandemic, I have been conducting contested hearings and trials by video conference using Zoom.

[2] Targeted is another company that financed the Debtor's purchase of additional roll-off containers at the same time as the Pawnee financing and that repossessed certain containers.

2

Exceptions to discharge are construed strictly against creditors and liberally in favor of debtors. Cohn, 54 F.3d at 1113 (3d Cir.1995); In re Glunk, 455 B.R. 399, 415 (Bankr. E.D. Pa.2011). A creditor objecting to the dischargeability of an indebtedness bears the burden of proof. Cohn, 54 F.3d at 1113; In re Stamou, 2009 WL 1025161, *3 (Bankr. D.N.J. Mar. 19, 2009); In re Marcet, 352 B.R. 462, 468 (Bankr. N.D. Ill. 2006). The burden of proof must be satisfied by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991); In re August, 448 B.R. 331, 357 (Bankr. E.D. Pa. 2011).

### B.  11 U.S.C. §523(a)(2)

The standards for determining nondischargeability under 11 U.S.C. §523(a)(2) are well settled:

> To prevail on a complaint brought under § 523(a)(2)(A), a creditor bears the burden of proving the following elements by a preponderance of the evidence:
>
> 1. the debtor made a material misrepresentation of fact that he or she knew at the time was false or contrary to his or her true intentions;
>
> 2. the debtor made the representation with the intention and purpose of deceiving the creditor;
>
> 3. the creditor justifiably relied on the representation; and
>
> 4. the creditor suffered a loss or damages as a proximate cause of the false representation or act.
>
> Intent is a required element of § 523(a)(2)(A). . . . Determining whether a debtor had the requisite fraudulent intent is a subjective inquiry. In this Circuit, intent and knowledge may be inferred based on the totality of the circumstances.

In re Singh, 433 B.R. 139, 161 (Bankr. E.D. Pa. 2010) (quotations and citations omitted).

In addition, it is a matter of "well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A)." In re Giquinto, 388 B.R. 152,

166 (Bankr. E.D. Pa. 2008). Instead, "to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms." (Id.) (quoting In re Maurer, 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990)).

### C. 11 U.S.C. §523(a)(6)

In 2020, I summarized the legal principles applicable in a determination of nondischargeability under §523(a)(6) as follows:

> Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).
>
> "Willful" and "malicious" are distinct elements. E.g., In re Coley, 433 B.R. 476, 497 (Bankr. E.D. Pa. 2010).
>
> A "willful" injury is an injury that is done deliberately or intentionally. Id. (citing Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)). In Geiger, the Supreme Court clarified that in § 523(a)(6):
>
>> [t]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury... [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."
>
> 523 U.S. at 61-62, 118 S. Ct. 974 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).
>
> In the Third Circuit, "actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are 'willful' within the meaning of § 523(a)(6)." Coley, 433 B.R. at 497 (citing In re Conte, 33 F.3d 303, 307-09 (3d Cir. 1994)).
>
> "Malice refers to actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." In re Kates, 485 B.R. 86, 101 (Bankr. E.D. Pa. 2012) (internal quotations omitted). The "wrongfulness" which characterizes malice involves conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as

4

distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional "aggravated circumstances." In re Jacobs, 381 B.R. 128, 139 (E.D. Pa. Bankr. 2008) (quoting In re Long, 774 F.2d 875, 881 (8th Cir.1985)).

Thus, to prevail, the plaintiff must establish three (3) elements demonstrating that the debt arose from an injury that was:

(1) willful (i.e., involving deliberate and intentional conduct);

(2) intended or substantially certain to cause injury; and

(3) malicious (i.e., wrongful).

In In re Tzabari, 622 B.R. 332, 341-42 (Bankr. E.D. Pa. 2020),

In addition to these principles, other considerations come into play when a §523(a)(6) claim is related to a breach of a contractual relationship.

As I observed in Coley, the expression of "malice" in terms of wrongful behavior that is without just cause or excuse is extremely broad, with the potential for an overbroad application of the §523(a)(6) discharge exception. Courts have narrowed the term's potentially overly expansive scope by suggesting that "malice" under §523(a)(6) must arise from tortious activity, as opposed to a mere breach of contract — but also, that the existence of a tort as the source of liability is not, by itself, sufficient to render the debt nondischargeable. The tort must be an intentional tort, not one based on mere negligence or recklessness. Coley, 433 B.R. at 499.

One line of cases under §523(a)(6) involves a debtor's violation of his or her obligations under the loan and security documents that diminishes, impairs or extinguishes the creditor's collateral. Again, this is a subject that I have previously examined:

Because conduct that impairs a creditor's collateral is rooted in the parties' contractual arrangement that created the creditor's property interest in the collateral, analyzing § 523(a)(6) cases of this nature "can be a perplexing exercise," In re Trantham, 286 B.R. 650, 663 (Bankr. W.D. Tenn. 2002), rev'd, 304 B.R. 298 (6th Cir. B.A.P. 2004), presenting "unique conceptual difficult[ies]." [In re] Whiters, [337 B.R. 326, 345 (Bankr. N.D. Ind. 2006)]

5

> The seminal case on the subject . . . is <u>Davis v. Aetna Acceptance Co.</u>, [293 U.S. 328, (1934)], decided under § 17a of the former Bankruptcy Act, in which the Supreme Court stated:
>
>> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception.... But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.
>
> 293 U.S. at 332, 55 S.Ct. 151 (citations omitted).
>
> In light of <u>Davis</u>, there appear to be two propositions on which there is some judicial consensus in § 523(a)(6) nondischargeability cases involving impairment of a secured creditor's collateral. First, most courts do not categorically rule out the possibility that a purposeful breach of a contract, in some circumstances, can cause a willful and malicious injury, particularly if the breach is accompanied by a tortious act, such as conversion. Second, "[s]imply because the sale [of the collateral] was in violation of the security agreement and was in fact an intentional sale on the part of debtor should not be enough to trigger a finding of malice." <u>In re Grier</u>, 124 B.R. 229, 233 (Bankr. W.D. Tex. 1991); see <u>In re Armstrong</u>, 2006 WL 2850527, at *11 (Bankr. D. Idaho Oct. 3, 2006) ("if the conversion of collateral is done through an honest but erroneous belief there is authority to sell or dispose of collateral and use the proceeds, even if such conduct can be viewed as negligent, unreasonable or reckless, the resultant liability to the secured creditor is dischargeable under § 523(a)(6) because the requisite intent to cause injury is lacking") . . . . The difficulty, then, is determining what renders the injury to a creditor's property "malicious" and therefore, nondischargeable under § 523(a)(6).
>
> . . . .
>
> [T]he particular factual circumstances giving rise to the impairment of the creditor's collateral may influence the court's evaluation of the debtor's conduct under § 523(a)(6). See generally <u>Whiters</u>, 337 B.R. at 345 ("the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is a result of a negligent or reckless tort—but not willful or malicious").

<u>Coley</u>, 433 B.R. at 500-01 (some citations omitted).

## IV.  FINDINGS OF FACT

After consideration of the testimony and evidence offered by both parties, I find the following facts.

### Lauer Disposal Services

1. In 2018, Michael Lauer ("the Debtor") was the owner, sole member and sole employee of Michael P. Lauer, LLC ("Lauer LLC") and Lauer Disposal Services, Inc. ("Lauer Disposal").  (Jt. Pretrial Stmt. ¶¶ 1, 2).

2. At all relevant times, the Debtor was the sole individual in control of both entities.  (Jt. Pretrial Stmt. ¶ 3).

3. Lauer Disposal was formed on September 18, 2017 and began operating as a residential trash pickup company in 2018, primarily hauling heavy material such as logs and demolition concrete.  (Jt. Pretrial Stmt. ¶ 4).

4. The Debtor initially began operations of Lauer Disposal with old containers he bought in 2016 at scrap price.  (Tr. at 88).

### The Financing Arrangements for the Mack Truck and the Roll-Off Containers

5. In June 2018, Lauer LLC entered into an Equipment Finance Agreement with TopMark Funding, LLC ("TopMark") to acquire a 2001 Mack Tri-Axle Roll-Off Container Truck ("the Mack Truck") to use in furtherance of Lauer Disposal's business.  (Ex. P5; Jt. Pretrial Stmt. ¶ 13).

6. The purchase price for the Mack Truck was $32,500.00.  The term of the agreement was 36 months with a monthly payment of $1,228.60.  (Ex. P-5).

7

7. Although Lauer LLC was the borrower under this agreement, the Debtor authorized automatic withdrawals from Lauer Disposal's bank account with M&T Bank in payment of this debt. (Id. at 5).

8. TopMark assigned all of its rights related to the Mack Truck to Pawnee. (Id. at 8).

9. In July 2018, TopMark brokered an agreement ("the Container Finance Agreement") with Lauer LLC to finance the purchase of 53 roll-off containers with the financing divided among three (3) different lenders: Pawnee, Blue Bridge Financial, LLC, and Targeted Lease Capital ("Targeted").

10. In the transaction, TopMark assigned to Pawnee its security interest and right to collect $53,033.00 on account of thirteen (13) of the roll-off containers purchased by Lauer LLC.[3] The repayment terms were monthly payments of $1,360.40 for 60 months. (Ex. P-1 at 1; Jt. Pretrial Stmt. ¶¶ 5, 7).[4]

11. In the transaction, Pawnee obtained a first-priority security interest in the thirteen (13) roll-off containers that were delivered to Lauer Disposal. (Ex. P-3; Jt. Pretrial Stmt. ¶¶ 8, 9).

12. Prior to accepting the assignment from TopMark, Pawnee reviewed the terms and conditions negotiated by TopMark and found nothing to suggest the Debtor was not creditworthy or that any other grounds existed to reject the assignment. (Tr. at 18).[5]

---

[3]    There were two different size roll-off containers purchased under the Container Finance Agreement: eight (8), 30-yard roll-off containers (serial #s 26560-26567) and five (5), 20-yard roll-off containers (serial #s 26578-26582). (Ex. P-1, at 8).

[4]    Blue Bridge Financial accepted an assignment to finance the purchase of ten (10) roll-off containers and Targeted accepted an assignment to finance the purchase of thirty (30) roll-off containers. (Jt. Pretrial. Stmt. 11).

[5]    The notes of testimony were transcribed and are referred to herein as "Tr."

13. Both Lauer Disposal and the Debtor guaranteed the Container Finance Agreement. (Ex. P-1 at 3-4; Jt. Pretrial Stmt. ¶ 6).

14. At the time of the transaction, all parties were aware that although Lauer LLC was purchasing the roll-off containers, Lauer Disposal would use them in its business operations. (Jt. Pretrial Stmt. ¶ 10).

15. The Debtor authorized automatic withdrawals for repayment of the debt to Pawnee from Lauer LLC's account with BB&T Bank. (Ex. P-1 at 8).

16. The vendor supplying the thirteen (13) roll-off containers was Stone Valley Welding, LLC ("Stone Valley"). (Ex. P-1 at 8-9).

17. The acquisition of fifty-three (53) containers was a dramatic increase in the business model of Lauer Disposal. (Tr. at 89).

18. Over the course of the following two (2) months (between July and September 2018), Lauer Disposal received delivery of the fifty-three (53) roll-off containers at a yard located on Horseshoe Pike in Honey Brook Township ("the Yard"). (Jt. Pretrial. Stmt. ¶ 12; Tr. at 51, 90).

19. The Yard is open from approximately 6 a.m. to 5 p.m. An electronic gate with a keypad provides security for the Yard. (Tr. at 90-91).

20. At least four (4) other waste-hauling companies, including Red Wagon ("Red Wagon"), a waste-hauling business owned by the Defendant's son, Zachary Lauer, utilized and had access to the Yard. (Tr. at 72).

21. Red Wagon uses the same type of containers utilized by Lauer Disposal. (Jt. Pretrial Stmt. ¶ 20; Tr. at 72).

22. In its business, Lauer Disposal rented the containers to customers for their use at the customer's location.

23. After receiving the fifty-three (53) containers, the Debtor never recorded the serial numbers or documented any identifying information for each container. (Jt. Pretrial Stmt. ¶ 19; Tr. at 71).

24. The Debtor did not maintain any written or digital business records to track his inventory or whereabouts of the containers that were off-site and in the possession of Lauer Disposal's customers.[6] He relied on his memory and on customers calling for pickup/removal of the container. (Tr. at 73-74).

25. As secured lender, Pawnee also did not maintain an inventory of the containers. Pawnee relied on Stone Valley's recordkeeping to identify the serial numbers on the containers purchased by Lauer LLC. (Tr. at 23).

### The Disappearance of the Containers

26. Two (2) months after entering into the Finance Agreement, in approximately the first week of October 2018, the Debtor discovered that one (1) container was missing from a job site. He concluded the container was stolen after speaking with the property owner, called the state police and filed a report. (Tr. at 54, 96).

27. Upon returning to the Yard within the next twenty-four (24) hours, the Debtor noticed another six (6) or seven (7) containers were missing and again called the state police to advise more were missing. (Tr. at 55). He also called Stone Valley and Targeted, neither

---

[6] The Debtor claimed that the absence of records of inventory is typical in the waste disposal industry. (Tr. at 105). I do not find that assertion credible.

of which had any information about the missing containers. At this point, the Debtor learned that the containers were insured. (Tr. at 55, 93).

28. The Debtor reported the perceived theft to the insurance company. (Tr. at 55-58).

29. The Debtor's insurance claim was denied.[7]

30. On October 31, 2018, Targeted's agent, Asset Compliance Solutions, acting through a subcontractor (Five Star Recovery), repossessed seven (7) containers. (Tr. 34-35; Ex. P-12).[8]

31. During October and November 2018, numerous other containers were taken or disappeared from the Yard.[9]

32. By November 2018, all of the containers were gone from the Yard. (Tr. at 75).

33. To date, forty-six (46) containers, including all of Pawnee's thirteen (13) containers, have not been accounted for or recovered.

### After the Disappearance of the Containers

34. Following the disappearance of the containers, Lauer Disposal continued to make payments to Pawnee until approximately May 2019. (Tr. at 103).

---

[7] The Debtor testified that the insurance company denied the claim because the serial numbers of the missing containers he provided did not match the serial numbers they had on record. (Tr. at 56-58).

[8] The repossessed containers referenced in Ex. P-12 may have been the same containers the Debtor reported as stolen, but this is not certain from the evidence.

[9] How and why this occurred forms the essence of the parties' dispute in this adversary proceeding.

35. In June 2019, Lauer Disposal leased the Mack Truck to Red Wagon, with Red Wagon making the monthly lease payments to Pawnee of $1,250.00. (Ex. P-4).

36. Prior to their disappearance, Pawnee may have contemplated, but never attempted repossession of its thirteen (13) containers, although there were numerous occasions that the Debtor made late payments. (Ex. P-7; Tr. at 14, 26).[10]

### The Debtor's Role

37. The disappearance of the thirteen (13) containers that served as Pawnee's collateral was not the result of the Debtor's fraudulent or willful and malicious conduct within the meaning of 11 U.S.C. §523(a)(2) and (a)(6).[11]

### IV. DISCUSSION

I begin with Pawnee's §523(a)(6) claim as I perceive that to be the main basis of its request for a nondischargeability determination.

---

[10] Targeted, on the other hand, claims to have attempted to repossess its thirty (30) containers. Targeted's third party repossession company, Asset Compliance Solutions, recovered seven (7) containers. Those seven (7) containers were sold back to the original vendor for $2,500.00 each. (Tr. at 32-33). Targeted's decision to cease its efforts to locate the remaining twenty-three (23) of it thirty (30) was a cost-based business judgment. Targeted initiated a lawsuit, but then withdrew it. (Tr. at 38). Targeted did not file an adversary in this bankruptcy case.

[11] I elaborate on this mixed fact/law determination or ultimate finding of fact in the Discussion in Part IV below.

### A. §523(a)(6)

### 1.

My analysis necessarily starts with an evaluation of the evidentiary record and the competing versions of the facts.

The parties have presented two (2) disparate, irreconcilable explanations for the disappearance of the containers.

Relying on the trial testimony of Targeted's representative, Pawnee emphasizes that Targeted was able to recover only seven (7) of its thirty (30) financed containers, while Pawnee recovered none of the thirteen (13) containers it financed. Pawnee appears to suggest that the disappearance of so many large containers could have occurred only with the Debtor's knowledge and participation  It posits that the most likely explanation is that the missing containers' disappearance was part of the Debtor's scheme benefit his son's company, Red Wagon. This is an inferential explanation because there is no specific evidence that the Debtor arranged for the removal of the containers from the Yard or that Red Wagon has possession of them.[12]

The Debtor's denies having anything to do with the containers' disappearance. His explanation is complicated, but he suggests that he may have been the victim of a scam, perhaps involving the lenders or their agents.

In response, Pawnee would have the court find that the Debtor's testimony is false and that his active participation in the loss of the containers is the only remaining possible explanation.

---

[12]   Pawnee points to the facts that the Debtor's son runs a similar business and that the Debtor sub-leased the Mack truck to his son's business. Of course, the Mack truck did not disappear and the evidence at trial was that the loan on the truck was repaid. (Tr. at 16).

To resolve these competing visions of history, it is first necessary to examine more closely the Debtor's explanation.

**2.**

The Debtor testified substantially as follows.

Approximately one (1) week after he noticed the disappearance of several containers, see Findings of Fact Nos. 26-27, two (2) men carrying firearms with a tow truck and a full-sized roll-off truck came to the Yard. The tow truck driver identified himself as an agent of Asset Compliance Solutions, a third-party repossession company. (Tr. 93-94).

The Debtor claims that the tow truck driver showed him, but did not provide a copy of, repossession papers for sixty (60) units, which was the entire inventory of containers used by Lauer Disposal. The Debtor says that he only saw the top sheet, which had Targeted's name in the top corner. (Tr. at 60).

Although most of the containers were out on jobs when these repossession agents arrived, there were approximately a dozen containers in the Yard.[13] As a result, the Debtor believed that the repossession agents were able to pick up five (5) containers that day. (Tr. at 98).[14]

The Debtor testified that he called the police but understood there was nothing the police could do because the police deemed his complaint a civil matter due to the repossession order. The police generated only an incident report, not a police report. (Tr. at 62-63, 78; Ex. P-9).

---

[13] The Debtor stated that he could only house about 12 units at that time because he was renting four (4) stalls at the storage facility, holding three (3) units each. (Tr. at 97).

[14] This is roughly consistent with Ex. P-12 which shows Targeted as repossessing seven (7) units on October 31, 2018. But it also is consistent with the Debtor's testimony that, one (1) week earlier, he noticed that six (6) or seven (7) containers were missing from the Yard. (Tr. at 55).

14

Because the repossession efforts encompassed the containers securing Pawnee's loan, the Debtor said that he contacted Pawnee and was told that Pawnee "would look into it." (Tr. at 101).

Thereafter, the Debtor says that he complied with the repossession requests, upon the advice of counsel, by periodically picking up containers for repossession from his customers' sites and bringing them back to the Yard. Once back in the Yard, they would disappear when the Debtor was not present, presumably taken by the same repossession agent. (Tr. at 99).

The Debtor asserted that in light of Targeted's repossession order, he and his lawyer had made a "deal" with Targeted to get the containers back eventually. (Tr. at 99).[15]

In addition, the Debtor testified that, despite believing he was current on his payments, he assisted Targeted's agent in their collection efforts because he did not want anyone to tell his clients that his business was financially unstable. The repossession process occurred over the course of the following four (4) weeks. (Tr. at 97-100, 111).

The Debtor also continued to make payments to Pawnee until December 2019. (Tr. at 19-20). The Debtor explained that the payments were set up to be made automatically from his account, and he was unable to make them stop. In addition, he testified that his lawyer advised him that if he kept making the payments eventually "this would work out: and he would get the containers back. (Tr. at 65-66).

**3.**

To say this case is factually challenging is an understatement. The parties' positions are entirely at odds and the record has cavernous gaps, making it nearly impossible to devise any

---

[15] The Debtor did not elaborate on the details of this "deal."

15

coherent narrative that explains the disappearance of the containers. In such cases, the outcome often is determined by the burden of proof. That is the case here.

The evidence definitively establishes only three (3) things: (1) Targeted retained an agent to repossess containers; (2) the agent repossessed seven (7) containers; and (3) the remaining containers are missing. There is almost no evidence showing who took the missing containers or where they are. In his testimony, the Debtor provided something of an explanation (pointing his finger at Targeted or its agents), but that explanation was imprecise and lacked corroboration. Pawnee offered no direct evidence on the subject.

Pawnee's theory of the case is reminiscent of the doctrine of *res ipsa loquitur*. Pawnee seems to be suggesting that in the absence of some reasonable explanation for the disappearance of the containers that were in the Debtor's possession, the court has no other choice but to infer that the Debtor actively participated in a scheme to remove them from Pawnee's reach.[16]

---

[16] One court has explained the doctrine of *res ipsa loquitor* as follows:

> *Res ipsa loquitor* is a doctrine by which a tort victim can prevail in a negligence action without direct evidence of the defendant's negligence. It allows the plaintiff to satisfy her burden of producing evidence of defendant's negligence by showing that the injury is the sort that normally would not occur in the absence of defendant's negligence. Quinby v. Plumsteadville Family Practice, Inc., 589 Pa. 183, 907 A.2d 1061, 1071 (Pa.2006) (citing William L. Prosser, Law of Torts §§ 39, 40 (4th ed.1971)). To satisfy the elements of *res ipsa loquitor*, the Plaintiff must show:
>
>> (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
>>
>> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and
>>
>> (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

Robbins v. Greyhound Lines, Inc., 2008 WL 4522485, at *2 (E.D. Pa. Oct. 7, 2008).

In response, Debtor swears that he had nothing to do with the containers' disappearance and that the repossession agent (or someone else) took the rest of the containers.

The largest hole in the record is that there is no evidence from the repossession agent (Asset Compliance Solutions) and its subcontractor (Five Star Recovery) that would allow the court to test the credibility of the Debtor's complicated explanation for the disappearance of the containers. The Debtor was the only witness with any first-hand knowledge of the events. Thus, the required factfinding turns entirely on his credibility.

In considering the Debtor's testimony, there certainly are points that strike me as curious — even arguably implausible.

A repossession agent for Targeted appeared with paperwork for the repossession of sixty (60) units despite the fact that Targeted only had a security interest in thirty (30) units. The Debtor called Targeted, who informed him that they were not repossessing the units. (Tr. at 62). The Debtor told the repossession agents that they were taking the wrong units, but they took them anyway. (Tr. at 76). The Debtor contacted both Pawnee and Blue Bridge to inform them that Targeted was taking their collateral, and both creditors told the Debtor that they would look into it. (Tr. at 101). And, despite being current on his account with Targeted, the Debtor and his lawyer apparently declined to assert the Debtor's rights and, instead, cut a deal with Targeted (whose terms are unexplained) to let them repossess his containers. (Tr. at 99). Assuming that the Debtor had competent legal counsel, that last assertion is particularly hard to comprehend.[17]

---

[17] The Debtor bears some responsibility for the shortfall in the record. While Pawnee did not ask the Debtor to identify the Pawnee representative with whom he spoke regarding the overinclusive repossession, neither did the Debtor's counsel. The attorney with whom the Debtor consulted (and whose advice he says he followed) may well have had knowledge that would have shed light on the events. But the Debtor did not call him as a witness. Of course, it is Pawnee, and not the Debtor, that bears the burden of proof.

However, based on my observation of the Debtor's during his testimony and what I learned about his educational background and work history, I found that he presented as a generally credible witness. Further, Pawnee did not rebut his testimony. Pawnee's counsel did not inquire further into the rationale or logic of the alleged deal struck by the Debtor's attorney. Perhaps more importantly, Pawnee offered no evidence to rebut the Debtor's testimony that the repossession paperwork called for the repossession of sixty (60) units or that the Debtor advised Pawnee of the ongoing repossessions. Pawnee presented exhibits that merely confirmed the recovery of the seven (7) containers.

**4.**

I have carefully considered the Debtor's strange account. While this is admittedly a close call, I find the Debtor's version sufficiently satisfactory and credible to overcome Pawnee's request that I reject it in its entirety. Therefore, I do not find, as Pawnee requests, that the Debtor's testimony was false and supports the inference that the Debtor participated in removing the containers from the Yard.

Once the main outline of the Debtor's testimony is credited -- that someone with apparent authority repossessed the containers -- Pawnee's case consists of nothing more than the facts that the containers are missing and that the Debtor cooperated in permitting someone to take them (who may have had apparent authority).

In the absence of some evidence that would allow the court to find the Debtor purposefully participated in the containers' disappearance for his own ends, Pawnee's §523(a)(6) claim fails. Pawnee has not proven that the Debtor's conduct was "willful" -- i.e., that he acted deliberately and intentionally in a manner that was substantially certain to injure Pawnee's property interest in the containers. Nor has Pawnee proven that the Debtor's conduct was

wrongful; the Debtor testimony is that he merely allowed what he believed to be lawful repossession of the containers to occur.[18]

### B. 11 U.S.C. §523(a)(2)

Pawnee's claim under §523(a)(2) requires little discussion.

Pawnee does not assert that the Debtor made any fraudulent financial representations to induce Pawnee to enter into the loan transaction to finance the purchase of the containers. Rather, Pawnee contends that in entering into the Container Finance Agreement, the Debtor intentionally misrepresented to Pawnee that he would fully pay for the containers and conduct his business in a careful and proper manner, but instead, intended to divert the containers to his son's business, while only paying a fraction of their value.

My analysis of Pawnee's §523(a)(6) claim is dispositive of its §523(a)(2) claim. Pawnee has not proven that the Debtor purposely removed the containers from Pawnee's reach in order to transfer them to his son's business and therefore, has not established that the Debtor entered into the loan for that purpose or that the disappearance of the containers otherwise was the product of a fraudulent scheme. Therefore, Pawnee's §523(a)(2) claim fails.

---

[18] Pawnee also argues the debt is nondischargeable under §523(a)(6) because the Debtor's was derelict in his record keeping and in a fulfilling a duty to secure the containers. This argument is without merit. To the extent that the Debtor's conduct is characterized as either negligent or reckless, it does not provide grounds for a determination of nondischargeability under §523(a)(6). Kawaauhau v. Geiger, 523 U.S. 57, 63-64 (1998).
.

## V.  CONCLUSION

The trial of this case may have left more unanswered questions than the questions it answered.  After considering the evidence presented, I am left wondering what really happened to the containers.  I understand why Pawnee suspects that the Debtor played an active role in their disappearance.  But Pawnee did not present enough evidence to support a finding that the Debtor was the culprit.

My resolution of this dispute turns on the burden of proof.

For the reasons stated above, I find that Pawnee has failed to satisfy its burden of proving, by a preponderance of the evidence, that the Debtor committed fraud or caused a willful and malicious injury to Pawnee.  Therefore, I will enter judgment in the Debtor's favor and against Pawnee on Pawnee's claims under 11 U.S.C. §523(a)(2) and §523(a)(6).


Date:   January 19, 2022                     _____
                                                        **ERIC L. FRANK**
                                                        **U.S. BANKRUPTCY JUDGE**